NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB #965128**
Assistant United States Attorney
Scott.Kerin@usdoj.gov
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:24-mj-00150 |
| v. | **GOVERNMENT'S MOTION FOR PRETRIAL DETENTION** |
| **NAVJOT SINGH,** | |
| **Defendant.** | |

The United States of America, through Natalie K. Wight, United States Attorney for the District of Oregon, and Scott M. Kerin, Assistant United States Attorney, hereby asks the Court to detain the defendant pending arraignment and trial as a risk of nonappearance and danger to the community.

Defendant was part of a larger criminal network that was targeting and extorting elderly citizens across the United States in which people claiming to be federal law enforcement officials were conning them out of their life savings through a series of various threats involving the potential seizure of their assets, their physical safety, and even their arrest. Defendant is an Indian citizen and he has strong family ties to India. Defendant lives in South Carolina, is

unemployed, and his only ties to Oregon are his involvement in this criminal conspiracy. Defendant presents a serious risk of flight and his fraud scheme presents an ongoing danger to the public. He should be detained.

A.     **Factual and Procedural Summary.**

The defendant was part of a criminal organization targeting elderly citizens across the United States in which a group of people, including someone claiming to be a Federal Bureau of Investigation (FBI) agent named Jon Stryker, were defrauding victims out of hundreds of thousands of dollars. In this case the group convinced the victims that they were in physical danger and their assets were subject to seizure by both hostile actors and possibly the Internal Revenue Service (IRS). It was all a scam – but resulted in innocent victims suffering very real and significant losses.

Defendant was arrested on Friday, July 12, 2024. On Sunday, July 14, 2024, he was charged in a criminal complaint with engaging in a Conspiracy to Commit Mail and Wire Fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349. He faces a maximum sentence of up to 20 years' imprisonment, a fine of up to $250,000, and three years of supervised release.

This particular case came to the attention of law enforcement on July 3, 2024, when the victims, a husband and wife, both in their upper 70s and currently living in West Linn, Oregon, contacted the FBI Portland Division to report that they believed they were victims of fraud being committed by individuals impersonating FBI Agents. At the time of reporting the victims had already lost approximately $279,475.

The victims reported that this all started on June 3, 2024, when the husband was on his computer and his screen went black and a message popped up instructing him to call the number

on the screen.  The husband called a number he had previously been provided, which he believed was a helpdesk number, and he was informed that his computer system would be fixed, but that they first had to transfer him to a Special Agent with the FBI who was investigating the matter.  The husband was then transferred to an individual claiming to be a FBI Special Agent named Jon Stryker (Stryker).

According to the victim, Stryker told him that he and his wife "were in danger" and they needed to be in constant contact with him to help ensure their safety.  The victim took this to mean they were in some sort of physical danger.  Stryker also informed the victims that they needed to download a program to help insure the safety of their computer, which they did.  After doing this their computer was taken over remotely and a four-page document with the heading "National Cyber Investigative Joint Task Force" popped up on the screen.  The document stated that this was all part of a confidential FBI investigation and not to tell anyone about it.  The document referenced the U.S. Code and several U.S. Acts that allegedly made it illegal for the victims to tell anyone about what was going on.  Stryker stressed that the victims had to comply with the document or face legal consequences.

Over the next few weeks, the victims maintained regular communications with Stryker, via phone and text messages, in which Stryker continued to inform them that they remained in danger.  During this time, Stryker gave the victims instructions to share their personal information and bank statements with him, which they did.  Stryker told the victims that he had drones that were keeping an eye on their home and he was making sure they were safe.  During one conversation Stryker made a comment to them about some work he knew they were having done on their fence in the backyard.  The victims believed they were being watched by Stryker.

///

In mid-June 2024, the victims were told that one of their Social Security numbers was linked to a cyber-attack against the FBI. At this time the victims were also informed that their financial assets were at risk and that hostile actors could seize their assets and that their assets could also be frozen by the IRS. The victims were instructed to secure their assets in the FBI-Secure Vault Service for safekeeping. There is no such FBI-Secure Vault Service, but the victims were convinced otherwise. Stryker informed the victims that gold was the most secure asset and then gave them specific instructions to purchase gold bars and package them in a sealed carboard box so they could be delivered to the secure storage facility. Stryker told the victims he would schedule a time for an "Agent" to come and collect the gold from them and it would be transported to the FBI-Secure Vault.

On June 17, 2024, the victims made a wire transfer to purchase $279,475 in gold bars. On June 18, 2024, the wire transfer processed through the victims' bank account. On June 22, 2024, the gold bars then were shipped and the victims informed Stryker that the gold arrived. Stryker then scheduled a pickup for the gold on June 22, 2024. On June 22, 2024, Stryker instructed one of the victims to go outside with the gold bars and place them, through the rear window, into the back seat of a Jeep Wrangler that would soon be arriving. The victim did as she was instructed and placed a box containing the gold bars in the back seat of the Jeep, which then drove off.

When the victims were asked about why they did this they repeatedly voiced the abject fear that had be instilled in them by Stryker. The victims absolutely believed that they were in very real physical danger and that all of their retirement money was at risk.

After contacting the FBI Portland Division on July 3, 2024, the victims reported that Stryker had reached out to them again and this time they were instructed to purchase an

**Government's Motion for Pretrial Detention**  Page 4

additional $193,000 in gold bars and that he would schedule another pickup with an "Agent." This time, law enforcement would be waiting. Agents and officers from the West Linn Police Department then prepared a controlled pickup operation that took place on July 12, 2024. Agents instructed the victims to notify Stryker that they had purchased approximately $193,000 in gold bars that could be picked up on July 12, 2024.

On July 12, 2024, at approximately 1:55 p.m., Agents and officers observed a black BMW X1 SUV (target vehicle) driving along the streets near the victims' house. Officers and Agents observed the target vehicle stop in front of the victims' residence. One of the victims walked out to the target vehicle with a decoy package while she was on the phone with Stryker. The victim then placed the decoy package in the back seat of the target vehicle through the rear window and the vehicle drove off.

Officers and Agents observed the target vehicle depart from the residence at a fast rate of speed and turn south. Shortly thereafter a marked patrol unit with West Linn Police Department conducted a traffic stop on the target vehicle. The driver in the target vehicle was identified as defendant. Inside the vehicle Detectives and Agents observed the decoy package sitting on the rear seat.

Defendant provided verbal consent to search the target vehicle. During the search, Agents located a booking ticket for Delta Airlines, dated July 12, 2024, in defendant's name which showed that he had flown into Portland, Oregon that day from Atlanta, Georgia. Agents also observed a black backpack that was identified as belonging to defendant that contained a few items of clothes and toiletries, which the agent estimated was enough for one to two days of travel.

///

**Government's Motion for Pretrial Detention**                                                                 Page 5

During the traffic stop, defendant informed Agents and officers that he lived in South Carolina. When asked what he was doing in Oregon, defendant initially told Agents and Detectives that he arrived in Portland about two days ago. Defendant later recanted and stated that he arrived in Portland yesterday. When asked what brought him to Portland, defendant initially stated that he was in Portland for construction work and that he received a WhatsApp call from an unknown person with the number 470-751-7063 asking him if he would pick up a package and deliver it to California. Defendant later stated that he was unemployed and had not been working for seven months due to a car accident where he injured his back. When asked why he flew out of Atlanta instead of Columbia or Charlotte airports, defendant stated that he was staying with his girlfriend. Defendant then stated that he and his girlfriend were together for four months and they broke up two months ago, and that he was actually staying at his home in Columbia the past 6 months. Defendant then stated his friend drove him from Columbia to Atlanta to fly to Portland. Defendant told Agents and officers that the unknown caller purchased his airline ticket from Atlanta to Portland and that he purchased the rental vehicle he was stopped in, a black BMX X1 SUV. Defendant also mentioned that he had no family here in the United States, that they all lived in India. After defendant was arrested and while he was in custody the victims received repeated "urgent" messages from Stryker asking them to contact him. The victims eventually blocked Stryker's number.

Agents have been investigating a series of similar cases across the United States. On May 30, 2024, a defendant was arrested in Oregon and charged in a criminal complaint after he showed up at a Salem residence to pick up what was purported to be $86,000 in cash. *See United States v. Ganesan*, Case No. 3:24-mj-112. In the *Ganesan* investigation the victim was ensnared after he clicked on a link on his computer which caused his computer to malfunction

**Government's Motion for Pretrial Detention**                                                                 **Page 6**

and a pop-up then appeared on his screen with a phone number. After calling the phone number the victim was transferred to an individual claiming to be FBI Special Agent Jon Stryker and he was told a fabricated story involving a cyber-attack linked to the victim and how his assets were subject to seizure and he could be arrested. The victims in the *Ganesan* case suffered a loss of $90,000. When Mr. Ganesan was arrested agents found approximately 36 ounces of gold bars in his car that he picked up from another individual earlier that day. Travel records showed that Ganesan had traveled to South Carolina, Arizona, Florida, New Jersey, Washington, Colorado, and Utah. Mr. Ganesan, an Indian national from Los Angeles, California, was detained as a flight risk by U.S. Magistrate Judge Stacie F. Beckerman.

The FBI Los Angeles Field Office is investigating another case where people purporting to be FBI Agents are demanding payment in the form of gold bars. In that investigation a victim also got ensnared after clicked on a link on his computer which caused his computer to have issues and a pop-up then appeared on his screen with a phone number. After calling the phone number the victim was transferred to an individual claiming to be FBI Special Agent Jon Stryker and he was told the same fabricated story involving the cyber-attack and the victim in the *Ganesan* case. In the Los Angeles case, Stryker called the victim and instructed him to purchase $90,000 in gold bars and that one of his "Agents" would pick up the payment. The victim purchased the gold bars and later an individual arrived at his residence in a car. After the car arrived, the purported "Agent" rolled down the rear window, the victim placed the package with the gold bars in the rear seat, and then the "Agent" drove away with the gold.

The Santa Barbara County Sheriff's Office has a similar investigation in which a person, believed to be Ganesan, picked up $40,000 from an extorted victim in March 2024. The victim reported that they were contacted by a person purporting to be the Deputy Police Commissioner

for U.S. Customs and Border Protection and that they had information the victim was involved in drug trafficking and that there was a warrant for their arrest and their assets could be frozen.

The full extent of this fraud scheme and the number of victims is still unknown.

The defendant is a danger to the community and a risk of nonappearance. He should be detained.

**B.      Applicable Law.**

**1.      Rules of Evidence Do Not Apply at Detention Hearing**

The Federal Rules of Evidence do not apply in pretrial detention proceedings. Fed. R. Evid. 1101(d)(3); 18 U.S.C. § 3142(f). Accordingly, both the government and the defense may present evidence by proffer or hearsay. *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986); *see also United States v. Bibbs*, 488 F.Supp.2d 925, 925-26 (N.D.Cal. 2007).

**2.      Standard for Detention**

Where the government seeks a hearing and the Court determines that there is "a serious risk that [defendant] will flee," a detention hearing is warranted. 18 U.S.C. § 3142(f)(2). Once a detention hearing is conducted pursuant to § 3142(f), the Court shall order a defendant detained if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

When a defendant is eligible for detention under 18 U.S.C. § 3142(f)(2) – because of his risk of flight or obstruction - rather than because of a qualifying § 3142(f)(1) charge, some courts, including Magistrate Judges in this District, have held that danger to the community falls out of detention analysis. *See, e.g.*, *United States v. Himler*, 797 F.2d 156 (3rd Cir. 1986); *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988); *see also United States v. Twine*, 344 F.3d 987,

**Government's Motion for Pretrial Detention**                                                                 **Page 8**

987 (9th Cir. 2003) (favorably citing *Himler* and *Ploof* without analysis); *United States v. Gunn*, Case No. 3:19-mj-207 (Mag. Ct. Or.). The government disagrees. The plain text of the statute says otherwise. Once a detention hearing is triggered under either § 3142(f) provision, the statute asks the same question—can any set of release conditions ensure the defendant's appearance and the community's safety? 18 U.S.C. § 3142(e). The statute's text also lines up with the purposes of the Bail Reform Act. *See United States v. Salerno*, 481 U.S. 739, 742 (1987) (explaining that the Act was passed, in part, to address "the alarming problem of crimes committed by persons on release").

However, even those courts that follow the narrower reading seem to agree that when a defendant poses a serious risk of witness interference, he should not be released unless the court finds conditions sufficient to mitigate that risk. *See Himler*, 797 F.2d at 160 (disallowing detention based on danger where there was no "claim that [defendant] would attempt to obstruct justice or intimidate a witness or juror.").

The United States bears the burden of establishing danger to the community by clear and convincing evidence; risk of flight need only be proved by a preponderance of the evidence. *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *Winsor*, 785 F.2d at 757. Concern about the safety of the community is not limited to concerns about violence; rather it is the *risk* that a defendant will continue committing crimes while on release that warrants their continued detention as a danger to the community:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concerns about safety be given a broader construction than merely danger of harm involving physical violence. This principal was recently endorsed in *United States v. Provenzano and Andretta*, in which it was held that the concept of 'danger' . . . extended to nonphysical harms such as corrupting a union. The committee also emphasizes that the risk that a defendant will

**Government's Motion for Pretrial Detention**                                                                                                    **Page 9**

>continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community."

S.REP. NO. 98-225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S.C.C.A.N 3182, 3195 (Bail Reform Act)(emphasis added).

In determining whether the defendant poses a danger to the community or risk of non-appearance, the Court should then examine the following four factors in deciding whether release is appropriate, which also factors dangerousness into the equation:

(1)    the nature and circumstances of the offense charged. . . ;

(2)    the weight of the evidence against the person;

(3)    the history and characteristics of the person, including –

    (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearances at court proceedings; and

    (B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal . . . ; and

(4)    the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g).

C.    **Factors Supporting Detention.**

Defendant is part of a criminal group extorting elderly citizens under the threat that their assets will be seized, that they were in danger, and that they could even be arrested – it was all a destructive scam. This criminal organization operates like a group of predatory locusts swarming across the country preying upon vulnerable people. The fear this group is inducing is traumatic and has led victims to lose significant amounts of money. The defendant's criminal conduct demonstrates he is a danger to the community and his lack of ties to Oregon and a

legitimate job make him an extreme a risk of nonappearance. He should be detained pending trial.

1. **Nature and Circumstances of the Offense.**

Defendant is part of a conspiracy where his role is to pick up money and gold from victims as part of a larger fraud scheme that is extorting people. The details of the investigation are outlined above and in the criminal complaint.

2. **Weight of the Evidence.**

The weight of the evidence against the defendant is extremely strong and supports his continued detention. The details of the investigation are outlined above and in the criminal complaint.

3. **History and Characteristics of the Defendant.**

The history and characteristics of the defendant also warrants his pretrial detention. Although defendant does not appear to have a criminal history, he is involved in an extensive nation-wide fraud scheme. He is an Indian citizen in the United States on a work Visa, although he told agents he is unemployed. His criminal conduct also places his ability to remain in the United States at risk as well. Defendant lives in South Carolina, has significant family ties to India, and his sole connection to this district is his commission of a crime. He should be detained.

4. **Nature and Seriousness of the Danger to the Community.**

Defendant's fraud scheme is exploitive, destructive, and extensive. Innocent people have been threatened with arrest and the seizure of their assets. The victims in this immediate case were scared out of this wits that their assets would be seized. For a retired couple who have saved their entire lives to be faced with the prosect of losing everything is absolutely terrorizing.

Danger to the community is not only physical violence, but it also encompasses financial and mental trauma as well. Defendant's crime was predatory and destructive. Defendant is a danger, a flight risk, and he should be detained.

## Conclusion

For the reasons set forth herein, we respectfully request that the Court continue to detain defendant pending his arraignment and trial and find, by a preponderance of the evidence, he poses an unacceptable risk of non-appearance at future court hearings and, by clear and convincing evidence and pursuant to the text of the Bail Reform Act, he is a danger to the community.

We ask the Court to find that:

- Pursuant to 18 U.S.C. § 3142(f)(2) and upon the government's motion, defendant's case involves a "serious risk" he will flee and thus a detention hearing is warranted pursuant to 18 U.S.C. § 3142(e).

- After evaluating the factors in 18 U.S.C. § 3142(g):
  - Due to the nature of the offense and the extreme financial dangers posed by defendant's fraud scheme there is no condition or combination of conditions that will reasonably assure the safety of other persons and the community if defendant were released.
  - Due to the weight of the evidence and defendant's personal history and characteristics, including the potential penalties he is facing on the current charges and his significant ties to a foreign country and another state, no condition or combination of conditions will reasonably assure the

///

appearance of the defendant at future court hearings as required if released from custody.

We ask that defendant be detained pending arraignment and trial.

Dated: July 15, 2024.                                    Respectfully submitted,

NATALIE K. WIGHT
United States Attorney

*/s/ Scott Kerin*
SCOTT M. KERIN, OSB #965128
Assistant United States Attorney